DUNCAN et al. v. CINCINNATI BUTCHERS' SUPPLY CO. et al.

(Circuit Court of Appeals, Sixth Circuit. June 29, 1909.)

No. 1,906.

1. PATENTS (§ 328*)—INFRINGEMENT—OVERHEAD TRAMWAY.

The Werner patent, No. 491,151, for a switching device for an overhead tramway, conceding its validity, discloses novelty only in the form of the switch board and the mode of operation, the principles being old, and must be limited to substantially the identical structure described. Claim 1, so construed, *held* not infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2.** PATENTS (§ 160*)—CONSTRUCTION OF CLAIMS—COMBINATIONS.

An element not mentioned in a claim of a patent for a combination cannot be read into it, although it may appear in the specification; but, if a claim includes an element in general terms and refers to the specification to identify it, such element may be read into the claim.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 235; Dec. Dig. § 160.*]

**3.** PATENTS (§ 157*)—CONSTRUCTION OF CLAIMS—COMBINATIONS.

Where an applicant for a patent in one claim makes no mention of an element, and in another includes it, the presumption is that he omitted it from the first on purpose.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 157.*]

**4.** PATENTS (§ 243*)—INFRINGEMENT—COMBINATIONS.

A claim of a patent for a combination is not infringed by a device which omits some elements of the combination, and contains others not included therein.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 382, 387, 388; Dec. Dig. § 243.*]

**5.** PATENTS (§ 328*)—INFRINGEMENT—OVERHEAD TRAMWAY.

The Werner patent, No. 571,607, for a switching device for an overhead tramway, claims 2 and 5 are valid as limited by reference to the specification, but, as so limited, *held* not infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Nathan Heard, for appellants.

C. E. Mehlhope, for appellees.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

SEVERENS, Circuit Judge. The appellants, Duncan and Judd, complain of an alleged infringement by the appellees of two letters patent, of which they claim to be owners, one of them being No. 491,151, granted February 7, 1893, to P. F. Werner, and the other, No. 571,607, granted November 17, 1896, to the same patentee. Both were for improvements in overhead tramways, and more particularly to switchboards and appliances designed to be put into a connection with a main track for the purpose of distributing on several rails to different places the carriers and their loads coming on a single track to the switch. The rails are hung on hangers suspended from an overhead beam or ceiling. The principal use of these tramways is in transferring the carcasses of animals from the slaughterhouse to various apartments for cooling off and temporary storage. The first of these patents consisted, so far as we are now concerned with it, in making an opening for a switch board between the end of the single main rail and the ends of the several rails proceeding from the switch, bolting a connecting piece to the end of the main rail on the one hand, and to the opposite end of the switch rail on the other, and so attached that the upper edge of the connecting piece will be a little below the top of the rails thus connected. On the connecting piece a switch board is mounted carrying short sections of rails. The purpose of this connecting piece is to stiffen the joint, which is somewhat weakened by making

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the opening, and also to supply a rest for the switch board, for which latter purpose an arm is carried out from the connecting piece and is cast, or made rigid, with it. This arm has a flat upper surface, has a hole near its outer end, and a rectangular, short post near the main part of the connecting piece. The switch board is a flat plate, resting upon the connecting piece as well as upon the arm of the connecting piece. A rod descends from the switch board through the hole in the arm and extending below forms a handle, by which the switch board is operated. This forms a pivot on which the switch board is turned horizontally. Through the switch board several rectangular holes are made, each of which is adapted to receive the post on the arm of the connecting piece. At the edges of the switch board and at proper distances from its pivot flanges are turned up in the form of rails, one straight for carrying the main line directly through; others curved to take the carrier to one or the other side. The switch board is operated by the handle below. If it is set with the straight edge or piece of track in line with the main track and it is desired to set the switch so as to connect the main with a side track, the operator will lift the switch board by its handle above the top of the post on the supporting arm, and then turning it around horizontally until the desired edge or piece of rail is presented in the opening, and then dropping the switch board to its place for maintaining that position. Figures 3, 4, and 7 sufficiently indicate the form and mode of operation of the device:

In figure 7 is shown the connecting piece, d, bolted to the rails, c, c, and having a hole, $d^7$, in the arm for the pivot, and a post, $d^6$, which rises through the rectangular opening in the switch board. In figures 3 and 4 is shown the switch board, e, having a pivot at $e'$ and an opening for the post at $d^6$, and at $e^1$ and $c^1$ are flanges which serve for rails on the edges of the switch board, one straight, the others curved. The lifting up and turning around of this switch board and letting it fall to place gives a continuous track in any desired direction.

The first claim only of this patent is alleged to be infringed, and is as follows:

"1. In an overhead tramway, the combination of rail sections, a connecting piece, and a pivoted switch board or turntable on said connecting piece, provided with two or more rail sections, substantially as and for the purposes set forth."

The validity of this claim is denied upon the grounds that it had been anticipated, and that it did not disclose invention. And it is further contended that, if it be valid, it can only be so for a structure so nearly identical with the description as not to include the defendants' device. Referring to the wording of the claim, it is seen that the novel features are "rail sections"; the "connecting piece" and a pivoted "switch board" having two or more rail sections thereon. These elements are in combination. The "overhead tramway" is mentioned to show in what kind of structures the devices could be usefully employed. So we are not concerned with the hangers on which the track is suspended, nor with the handle by which the switch board is operated.

Werner was far from being the first to devise a switch board intended to serve the same general purpose. Many such were already in use, most of them supported by a foundation, but several patented devices were already in use for the purpose of switching suspended rails. Of the former kind were the familiar switches in railroad tracks. In transferring a switch from the ground to rails suspended on hangers the same general features of the switch proper would naturally be indicated; but means must be devised for providing a rest for the switch in proper relation to the rail. As the switch must carry rails to effect the diversion, the switch board must be in the line of the rails and movable therein, and the support for the switch must have a rigid connection with the rails; otherwise there would be no security that the portions of rail on the switch board would maintain their proper relation with the lines of rails of which they form a part. This was the problem which Werner had before him. To hold the ends of the one rail in proper relation to the ends of the rails beyond the switch board, he used a device quite similar to the fish plates in common use on railroads for the same purpose. Of course, their proper place would be below the top of the rail. So far, there was nothing new. The use of a connecting piece was an old and obvious device employed in the same art. Then, how should he support the switch board carrying the switching rails? Obviously it could not ride on the narrow foundation of the connecting piece, and be manipulated thereon. He, therefore, extended a horizontal arm from the connecting piece for a broader foundation and formed a pivot thereon whereby the switch board with its rail portions could be turned horizontally to suit the various requirements.

All these suggestions followed each other in natural sequence, or, it is better to say, that the sequences were so far obvious as to raise serious doubt whether the perception of them was beyond the skill of one well trained in the art and familiar with the subject. Many things which seemed indicative of invention in earlier times have lapsed into the domain of the skill and prevision of the artisan, and the test of invention in the mechanical arts has risen to a higher plane as the eye, the hand, and the intelligence of the workman have been educated to higher issues. The fruits of the progress thus made belong to the general public, and the danger is that too many of the utilities of life may be covered by the ever-increasing flood of patents, too many of which may have little or no right to a monopoly. Connecting pieces attached to rails at their ends for the purpose of holding them rigidly in place were, as we have said, common in the art. We have referred to fish plates bolted to the sides of rails. Switch plates or turntables carrying sections of rails and turning on a pivot whereby cars were switched from one rail to one of several others were also in use and some of them patented before Werner's patent was applied for. Some of these patents shown in this record disclosed such a switch resting on the ground, as Wharton's turntable, of date 1873; Harrington's turntable, 1883; Middleton and Cary, 1873; Williams, 1889; Allen, 1890. The last three were switches turning and resting on substructures. A patent granted in this country to Bocande, October 16, 1888, numbered 391,-294, for "a turntable switch for single line elevated railways," showed the same device. Figure 1 of the drawing is here inserted.

T is the turntable switch carrying sections of the rail A and of D and E. P is the pivot supported from below. It is readily seen that a carrier coming in from A can be switched to any of the radiating lines,

B, C, D, E, F, G, by turning the switch board in its horizontal plane. It is also seen that it fills an opening in the rails. In other patents for switches the switch rails rested on a platform, which was carried from side to side to fill an opening between the ends of rails and adapted to co-operate with them and take the carrier by different connections to different points, as in that to Donkersley, 1880. A number of patents in the earlier art are also shown for switches in overhead tramways suspended on hangers, such as Potter and McDougall, 1887; Hoershelman, 1888; McCredie, 1894; and, we think, Hibbard, 1896. The McCredie patent was not granted in this country until 1894, but it had been issued and recorded in a foreign country as early as 1887. It was numbered in this country 512,515. We notice it the more particularly because it disclosed a track along the edge of the switch board, a feature which is said to differentiate Werner's invention from former switch boards, in which the tracks were laid across the more central parts of the switch board. In this patent of McCredie's the switch board (or block as we call it) there was a lateral extension of the board, near the outer end of which was a groove in which the flange of the carrier wheel should run. The edge of the extended switch board and the groove were straight on one edge and curved on another. This construction formed a rail, which was not merely the equivalent of Werner's section of rail, but was almost identical with it. Thus different sections of rails were provided to go into the opening, and at the same time permit the unobstructed passage of the carrier. What Werner did was to take his pivot outside and locate his rail sections on the margin of his switch board. This was what McCredie did, and was necessary in order to make way for the passage of the carrier. The form and mode of operation were new, but the essential principles, as we have seen, were not. There was also some novelty in the form of his switch board. And these characteristics of his switch board are all there is of novelty in his device which savors of invention. All the rest could be gathered by an observing man from previous structures in the same art. There were so many patented devices in the field for the same purpose, though by slightly different means, that we are compelled to limit his invention, if it can be held valid, to substantially the identical structure devised by him. His invention is so limited as to restrict the range of equivalents to almost none at all. In view of the length of time it has been acquiesced in and the presumption from the grant, we are disposed to concede its validity. His claim 1 is for a combination of the connecting piece and the switch board. There can be no infringement unless both these elements are used in the same form or an unimportant variation of the same form. We think that neither the switch board nor the connecting piece of the defendant are so far similar as to come within the scope of the complainant's patent. They accomplish a similar result, but the mode of operation is not the same. We postpone this particular description of the defendants' structure until we have examined the second of the Werner patents.

The patent No. 571,607 is also for a switching device in overhead tramways. It is more complicated, but more conveniently operated,

than his original device. In this he used, instead of one, two switch boards, one of which is operated by pulling a rope connected with a handle on one of the switch boards and the second operates automatically with the movement of the first. Figures 2 and 3 will serve to explain.

FIG. 2

FIG. 3

$d^2$ $d^2$ are the arms of the switch bracket, d. These arms are provided with bearings, $d^3$ $d^3$. A rail section, f, having a portion of rail, $f^4$, is pivotally arranged on the bracket. Another rail section, f, is journaled on the arm of the bracket, $d^2$, at $e^1$, and swings on it. It also has a rail portion, $e^2$. On the bottom of the first-mentioned rail section is a spur, $e^5$, which in operation descends into the opening, $e^3$, in the second rail section, and, engaging it, turns the second rail section back out of the way, while the first rail section is turned down and takes the place of the second. Reversing this operation the first rail section is thrown up and back, and the spur brings the second rail section forward to its place. We do not see that this arrangement permits of more than one switch rail beside the one provided for a continuous straight line, although the principle of its operation could be

applied to the provision of a switch turning off the main rail to the other side. The claims relied on are 2 and 5. They read as follows:

"2. In an overhead tramway, a switch, comprising therein, a switch-bracket, d, having arms, $d^2$, provided with bearings, a rail-section, e, pivotally arranged on said bracket, and having a rail portion, $e^2$, and a rail-section, f, journaled in the bearing portions of said arms, $d^2$, having a rail portion, $f^4$, and means for operating said rail-sections, substantially as and for the purposes set forth."

"5. An overhead tramway, comprising a rail or track, c, having a cut-away portion, $c^2$, and a disconnected rail, as $c^1$, of a switch-bracket secured to one side of said rail, c, directly in front of said cut-away portion, $c^2$, a rail-section, e, on said bracket having an upwardly-extending rail portion, $e^2$, adapted to be forced into said cut-away portion, $c^2$, a second rail-section, f, on said bracket having a rail portion adapted to connect a portion of said cut-away part, $c^2$, with said disconnected rail, $c^1$, as set forth, and means for operating said rail-sections, e and f, substantially as and for the purposes set forth."

It is to be noticed that claim 2 omits all mention of the spur on the bottom of the first rail section and of the opening in the second rail section, or of any means by which the second rail section is affected by the movements of the first. And yet such means would be an essential part of the invention. But claim 5 calls for "means for operating said rail sections, e and f, substantially as and for the purposes set forth." The rules applicable to the construction of these claims in this regard are, first, that we cannot read into a claim for a combination an element not mentioned in it, although it may appear in the specifications; and, secondly, that if the claim includes an element in general terms, and refers to the specification to identify it, we may read that element into the claim—a rule of construction applicable to all written instruments; and, thirdly, that where the applicant for a patent in one claim makes no mention of an element, and in another includes it, the presumption is that he omitted it in the first on purpose. A patentee may include in or omit from his claims so much of the matter of the specifications of his invention as he pleases; but he is bound to state distinctly what part of it he intends to claim as his own.

Now, it would seem to us that the provision of some means for getting the second rail section out of the way for the other, and vice versa, savored quite as much of invention as any other feature of his device, and, if we leave that out of the claim, it would leave the field open to others to use it in any combination they might wish to organize. Whether this claim can be supported is a question not free from doubt. Conceding, however, that the fifth claim exhibits a novel combination and a degree of ingenuity which qualifies it to rank as an invention, the question whether the defendants infringe it remains to be considered.

In view of the many devices which had been conceived and used prior to this invention of Werner's, it is obvious that it cannot be accorded the rank of a primary invention. In some respects it was novel. In those respects we find the measure of the equivalents which no other person may employ. His patent does not shut out all other means for accomplishing the same object, but only those which involve

the same mode or principle of operation. The defendant's switch is made under a patent granted for an invention by Schmidt and Werner in 1903. Figure 1 is selected for explaining it.

At first sight it resembles the second Werner patented switch. But on analysis of its construction it is found to be an essentially different organization. There are two track sections, 16 and 17, having each a rail on its margin, but here the similitude to any new feature of Werner's ends. The rail sections of the defendant are not separate from and movable on each other, as in the Werner patent, but are cast in one piece rigidly on a common pivot around which both the switch plates revolve. Neither of the plates moves horizontally, as does the lower one in Werner's. A chamber is made below the lower plate, into which it drops on being brought backward and downward off the lugs which support it at either end. These lugs are beveled off on their inner faces so as to form an incline from top to bottom, down which the face or edge of the lower section slides. The operation by which the shifting of one rail section for the other is effected is peculiar. Slitted bearings are made in the casing at either end. These slitted bearings extend upward and backward, and in them are journaled the ends of the pivot, on which the rail sections are arranged at about a right angle. When the lower section is pulled backward and upward, the pivot rises in its bearings, the rail section is drawn off the lugs on which it normally rests, its face or edge slides down on the inclined inner face of the lugs into the chamber. At the same time the other rail section is coming forward and down until it rests on the same lugs. Thus the switching to one of the diverging rails is effected. Simply reversing the process, the upper section is thrown over and back to its former place, and the lower section comes up to its place and by the effect giv-

en to the slotted bearings of the pivot, as the pivot descends therein the rail section is thrust forward into place as soon as it reaches the top of the lugs, and then rests thereon.

The mode of operation and the adaptation of the means to secure it in the Schmidt and Werner patent are so far different from that of the switches shown in the two Werner patents that it cannot be held to infringe them. The difference is in the vital part of the mechanism for shifting the rails which is the purpose of a switch. In the second Werner patent, the devices in which are most like those of the defendant's patent, no means for making the shift being contained in the second and fifth claims, if we should bring in by the reference at the end of the claims the devices pointed out in the specifications for that purpose, this would complete the claims. And this would be the basis for comparison with the defendant's. The spur on the under side of the upper rail section and the opening in the lower rail section constitute the individual elements for making a shift of the rails. In other claims they are expressly included as elements of the combinations. The defendant's switch has no such elements. Moreover, the Werner patent has the ordinary simple bearings on which the pivot of the upper section rail revolves. The lower swings on a pivot at the base of one of the arms of the bracket. The defendants lodge both sections on the same principal pivot and provide slotted and curved bearings for the pivot which effect a peculiar mode of operating the rail sections not found in the Werner patent. And, further, the lugs with inclined inner faces which also affect the mode of operation in the defendant's device are not found in the complainant's. All of the claims of the complainant involved in the controversy are for combinations. The elements of those of the respective parties are not only unlike in some of their characteristics, but those of the complainant's are some of those omitted by defendant and some of those of the defendant which contribute to the operation of the switch are not found at all in the complainant's. It would be flying in the face of well-settled principles in the patent law to hold that there is infringement in such circumstances as these. Prouty v. Ruggles, 16 Pet. 335, 341, 10 L. Ed. 985; McClain v. Ortmayer, 141 U. S. 419, 425, 12 Sup. Ct. 76, 35 L. Ed. 800; Black Diamond Coal Co. v. Excelsior Coal Co., 156 U. S. 611, 617, 15 Sup. Ct. 482, 39 L. Ed. 553; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 25 Sup. Ct. 697, 49 L. Ed. 1100.

The case seems to us an excellent illustration of the rule that when each of the two inventors improve upon the former art, each in his own distinct and separate way, they shall each be credited with his own improvement. It does not necessarily follow that, because the separate elements unaffected by their special adaptations might be found in both patents, the combinations are therefore the same. The observation of Mr. Justice Brown in Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136, at page 568, is very pertinent. Of course, it would be likely that some of the necessary features of such an apparatus would coexist, but, as we have said, the elements of the combination do not operate in the same way, although they attain the same object. The second and fifth claims of the second Werner patent are very artfully framed, and seem to aim

at including more than the specifications warrant. It is only by restricting them by the reference to the specifications that they can be supported and as so construed the defendant's switch does not infringe either of them.

The decree of the Circuit Court will be affirmed, with costs.