**BOCZ v. HUDSON MOTOR CAR CO.**
No. 5648.

District Court, E. D. Michigan, S. D.
May 17, 1937.

William G. Comb, of Detroit, Mich., for plaintiff.

Dike, Calver & Gray, of Detroit, Mich., for defendant.

TUTTLE, District Judge.

This suit involves four patents that were issued to Alexander J. Bocz. Mentioning them in the chronological order of the dates that they were issued, the first one, Exhibit 201, is patent No. 1,756,898, issued April 29, 1930. The second one, Exhibit No. 202, is patent No. 1,886,246, issued November 1, 1932. The third one, Exhibit No. 203, is patent No. 1,907,339, issued May 2, 1933. The fourth one, Exhibit No. 204, is patent No. 1,982,151, issued November 27, 1934.

It is admitted by the defendant, and I find as a fact, that the plaintiff is the owner of these four patents.

Plaintiff alleges in his bill that each one of these patents and every claim of each one of these patents is valid and has been infringed by the defendant, and the defendant denies, as to each claim of all four of the patents both validity and infringement.

The bill is peculiar in this respect: That it not only alleges the validity of the claims, but then proceeds and sets up the prior art, which is usually done by the defendant in its answer, and then further proceeds to explain away the particular patents of the prior art, which is a thing usually done in rebuttal. The proof has followed the bill in that regard. The plaintiff introduced the patents in suit and showed that he was the owner of them. He did not rely on the presumption of the law of validity, but proceeded to prove the patents of the prior art, and not only to do that thing which is usually done by the defendant in its proof, but then also as part of plaintiff's case explained those patents, which is usually done in rebuttal. I don't think there is any objection to that. It is fairness on the part of the plaintiff, rather than a subject for criticism, but I mention it as being unusual, both as to pleadings and as to the proofs.

In addition, the plaintiff orally requests the court to pass upon the validity of the patents. That is perhaps justified in this case because of the entire situation. Confusion has been caused as a result of the fact that plaintiff in the Patent Office and in the courts has been represented by so many different attorneys and during much of the time he has represented himself.

Plaintiff's present counsel is the fifty-third lawyer he has had in these problems. When we add the fact that during a large portion of the time these matters have been handled by plaintiff, who is not an attorney, one is not surprised that confusion is the result. He is entirely within his rights, because everyone has a right to appear in his own proper person and represent himself.

This record discloses the immense amount of time, thought, energy, and money plaintiff has devoted to the subjects here involved.

There is no doubt in my mind but that plaintiff conscientiously believes that he has made some valuable inventions and that the law ought to protect him in those inventions, and I am fully satisfied that he is convinced that others have used those inventions without compensating him. He has thought about that and worked with it until, like all of us when we are greatly interested in a thing, his own judgment is not good about it.

The extent to which plaintiff reaches hurried conclusions which are not correct is shown by the fact of this very suit against this defendant, alleging that it has infringed certain claims, which plaintiff now is frank to admit are not infringed. That just shows how easy it is for one that is so interested in a thing to reach a wrong conclusion. He thinks somebody has wronged him when he has not been wronged.

There are no claims of the patents in suit which are shown to have been infringed by defendant.

In spite of this, plaintiff asks this court to pass on the validity of these patents. I cannot help but think that if there were ever a case in which a plaintiff was justified in doing that, even though as to some claims he admitted they were not infringed, this is such a case; because here are some patents that are taking all of the plaintiff's energy, time, and money. The court owes it to plaintiff to tell him what the court thinks about these patents.

My sympathies are with the plaintiff. I have tried to watch the proofs carefully, to study these patents, and to study the prior art for the purpose of discovering something which could be preserved for him.

I am going to follow what the bill asks and what the plaintiff orally requests, and pass upon the validity of these patents.

Plaintiff has other suits pending. He has another suit in this court, against eight defendants, involving these same patents. The cases are expensive for him to try.

There are some principles of law concerning which I think the plaintiff is in error. Perhaps I have misinterpreted plaintiff's testimony and remarks on the subject, but there seems to be running through plaintiff's testimony and statements the thought that if he has invented something and has disclosed it to the public, the law will protect him in it.

I do not understand that there is anything in the patent law that attempts to go that far. It is my understanding of the patent law that one is protected only as to the very things he claims in his patent, and the things he gets allowed. It is the claims of the patent, not its specification, which measure the property of the patentee. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122, 1128; McCarty v. Lehigh Valley Railroad Co., 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358, 361; Winans v. Denmead, 15 How. 330, 343, 14 L.Ed. 717, 722. If he claims something and the Patent Office does not allow it, even though he were entitled to it, if he stops there and submits to that disallowance, he gets only what is allowed. We must go to the claims to find out what a patentee has, and he gets an exclusive right, to prevent others from doing that thing for seventeen years, if his patent is good.

The things he discloses in his specifications and drawings are for the purpose of supporting his claims, explaining them. Under some circumstances, we construe the claims broadly, and under other circumstances narrowly, but the real purpose of the specifications and drawings is to support the claims.

The claims of a patent are to be read in the light of the specification to ascertain their true meaning but are not thereby to be expanded. Permutit Co. v. Graver Corporation, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163; Chicago Forging & Mfg. Co. v. Bade-Cummins Mfg. Co., 63 F.(2d) 928 (C.C.A.6); Mills Novelty Co. v. Monarch Tool & Mfg. Co., 76 F.(2d) 653, 655 (C.C.A.6).

One should not make a claim unless it is supported by his specifications and his drawings, but no matter how much he might disclose by specifications and drawings, he only gets as his property what he claims.

Each claim must stand or fall and the question of infringement be decided upon the language used and the elements disclosed as in combination by that claim. White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303; Howe Machine Co. v. National Needle Co., 134 U.S. 388, 10 S.Ct. 570, 33 L.Ed. 963; Lakewood Engineering Co. v. Stein, 8 F.(2d) 713 (C.C.A.6); Farrington v. Haywood, 35 F.(2d) 628, 630 (C.C.A.6).

That shows how important it is that applications be drafted with care in order to protect the rights of the petitioners for patents. As to the things they disclose in the specifications and drawings, they become part of the art. That might prevent somebody later from getting a patent on what is disclosed, but so far as the patentee himself is concerned, they are of no more service to him, except so far as he claims them, than they would be if they were published in some newspaper or some trade journal, because it stands simply as a publication. His rights are measured by his claims. That is his property, if his claims are good.

There is running through this case, on the part of the plaintiff, the thought that he has some property rights in that which he may have invented and shown in his specifications and drawings, even if he did not claim them.

The court cannot read into a claim for a combination an element not mentioned in it, although it may appear in the specification. Duncan v. Cincinnati Butchers' Supply Co., 171 F. 656, 663 (C.C.A.6).

One cannot get a valid patent for anything which he or anyone else has put into public use or sold in this country for more than two years prior to the time when he applied for his patent. Another creature of the patent law, as I understand it, is that the trial judge can ignore a particular patent of the prior art if the plaintiff can carry the date of his invention back of the date of the application for the prior patent.

The difficulty about this rule from the standpoint of this plaintiff as a pat-

entee is that he incurs the danger of defeating himself by having put his invention into public use more than two years before his date of applications. He testified that he made the thing and used it, and disclosed it to the public, more than two years prior to his application. He offers this testimony for the purpose of overcoming the effect of the prior art, but forgets that the court is entitled to consider it in the nature of an admission on the subject of public use.

The same degree of proof is not sufficient to overcome the anticipatory effect of the prior art, because there he must have proof beyond a reasonable doubt. The law is very strict about it. It says we must not trust to people's memory, because it is so uncertain as to dates. We require working drawings or the actual thing brought into court. The courts, uniformly, have required that high grade of proof for the one making such contention. It is easy to admit things on a record, and the court will take it against a party, but if he is proving something against the other side, strict proof is required. If a patent has issued prior to the application for the patent in suit, and plaintiff is trying to have the court disregard the prior patent, he cannot admit that way. He must prove that away, and the proof required is of a very strict, exact, high type. Williamson Heater Co. v. Monitor Stove Co. (D.C.) 282 F. 906, affirmed (C.C.A.6) 299 F. 1; Columbus Dental Mfg. Co. v. Ideal Interchangeable Tooth Co. (D.C.) 282 F. 896, affirmed 294 F. 422 (C.C.A.1); Union Trust Co. v. White Motor Co. (D. C.) 22 F.(2d) 816, affirmed (C.C.A.6) 22 F.(2d) 821; Gibson v. Eastern Rim & Wheel Co., 32 F.(2d) 774, 776 (C.C.A.3); Stelos Co., Inc., v. Hosiery Motor-Mend Corporation, 72 F.(2d) 405 (C.C.A.2), affirmed 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414 (C.C.A.2).

I am satisfied that when plaintiff filed this bill he thought that the defendant was infringing his patent No. 1,982,151. When he comes to see what defendant was doing, he finds that defendant has not infringed any of the claims of that patent. It is for that reason, and for many reasons that the courts have laid down the strict rule that when one asks the court to make a finding that one person did something before another person did it he must prove that thing beyond a reasonable doubt.

Much has been said as to the kind of proof that is required, and it must be of a very different degree than what was required of the same party to make the admission that he had done something himself.

Some of the plaintiff's admissions as to what he did show that he thought out the invention long ago when he was in Hungary and as early as 1910. One of these devices was made and used as a dampener, or a balancer, or a counterbalance, on a marine gun controlled by a motor.

Later, in this country and many years before his application, he made a balancer or dampener, and put it on his own automobile. He says that he used it for a good part of a year, with success.

Those are all things that if he were trying to prove priority against another party would not be the kind of proof the court requires in order to overcome the other prior patents, but it is the kind of proof that would be sufficient in the way of an admission against interest of public use so long before he applied for a patent that he could not get a valid patent.

One cannot invent a thing and put it into public use or sale and then wait two years or over before applying for his patent on such thing. Andrews v. Hovey, 124 U.S. 694, 8 S.Ct. 676, 31 L.Ed. 557; Manning v. Isinglass Co., 108 U.S. 462, 2 S.Ct. 860, 27 L.Ed. 793; Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755; Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68.

The plaintiff also seems to have in mind that some of his own difficulties might change the law in that regard and let him wait more than the two years. He mentions in that connection that he was in law an alien enemy of the country, and that this explains in some way his delay. He also says that the faults of his attorney explain it. I don't know of anything in the law that would treat those things as excuses or justification for any setting aside of the two-year rule.

Plaintiff's admissions as to his early activities in this country place some of his patents in serious jeopardy, but in any event, there is no proof of the weight required to overcome the anticipatory effect of the prior art. These prior patents must stand as part of the prior art so far as my decision is concerned.

So in the light of the prior art as I find it and as it stands, I am going to take

these patents up one at a time and dispose of them on the question of validity.

Plaintiff's work has been done in a crowded art. For at least forty years, engineers and mechanics have been balancing, counterbalancing, and dampening the vibrations in a driven shaft or a driven wheel. The art is a network of patents.

One can hardly suggest anything that has not been done in so many different ways that the road has been plowed, dragged and cross-dragged.

■ Patent No. 1,756,898 was granted April 28, 1930, on an application filed August 16, 1926. This patent contains eight claims, all in suit, and the drawings show an eccentric balancer or dampener.

One can read claims 1, 2, 3, 4, 7, and 8 on Butz patent, No. 1,525,717, of February 10, 1925, because those claims that I have mentioned, 1, 2, 3, 4, 7, and 8, are broad claims.

This art was so old that there was not any room for anything unless it was for a detailed claim as to the structure. Those claims are broad. There is no eccentric or other detailed structural feature about them. While the showing in the drawings of patent No. 1,756,898 is of an eccentric balancer or dampener, the claims are so broad that they are not so limited and they read directly on Butz. I also mention as patents which anticipate these same claims 1, 2, 3, 4, 7, and 8 the prior patents to Robinson, No. 1,445,716, of February 20, 1923; Morgan, No. 379,022, of March 6, 1888; Masury, No. 1,627,917, of May 10, 1927; Manville, No. 1,641,230, of September 6, 1927.

Claims 5 and 6 are limited to an eccentric structure. These claims were also very old in the prior art. The engineers and mechanics fully understood that one could make these balancers or dampeners, both concentric and eccentric, and we find many eccentric devices shown in the prior patents.

As to claims 5 and 6, I mention the British patent to Somers, No. 247,911 of February 20, 1925. The only thing that is lacking when you read claims 5 and 6 on this British patent is that there is no universal joint. Everything else is there, and the universal joint was old. There are many universal joints in the concentric structures of the prior art. As to eccentric balancers or dampeners, we have the Manville patent, No. 1,641,230, of September 6, 1927, Masury, No. 1,627,917, of May 10, 1927, and Churchward, No. 707,389, of August, 1902, the patent to Esmond, No. 641,379, of January 16, 1900, the patent to Schreurz, No. 196,835, of November 6, 1877, the patent to Somers, No. 1,896,027, of January 31, 1933, and the patent to Clouse, No. 1,015,476 of January 23, 1912, and other patents, including British patent No. 141,139 of April 11, 1920.

Plaintiff may have had other ideas in his mind that were new, but all the courts can give to him is what he claims, and that only in the event there is nothing in the prior art to interfere with it. Here the prior art is full of things like he has claimed.

The differences that he mentions and the things that he has in mind, as distinguishing his patent from the prior art, were that the prior art devices would not work for certain assigned reasons. Plaintiff claims his device will work, but the fact is I have no proof before me of any use ever made of plaintiff's patents which would justify such a distinction over the prior art.

We sometimes say a thing has revolutionized the art and for that reason we can broaden the claim. Even if this structure had gone into great use, the scope of the claims could not be changed in this regard. At best, it differs only very slightly from what is in the prior art. The claims of patent No. 1,756,898 read so completely on the prior art that there is no room for these claims, and I hold them all void.

■ Now I come to the patent to Bocz, No. 1,686,246, granted November 1, 1932, on an application which was filed July 30, 1927.

This is the patent for the sectional balancer or dampener. There are three claims in this patent and all are broad claims.

These claims are broad enough to read on a sectional balancer, whether there are axial sections or radial sections in the balancer.

I can understand that a petitioner tries to get as broad claims as possible, but there is where the skill of patent attorneys comes in, and where it is dangerous for a man to represent himself.

He is likely to be like the boy who gets his hand into the jar to get the nuts and he gets so many he can't get his hand out of the jar. The Patent Office cannot comb the whole world with a fine-tooth comb, and no one is there to contest the granting of the claims. It is really a greater misfortune to get too broad a claim than it is too narrow a claim. Of course, both are misfortunes. One ought to get all he is entitled to, but if he gets his claim so broad that it reads on the prior art, then the breadth of the claim has destroyed it.

Here are claims so broad that they read on the sectional balancer or dampener, whether the sections are radial, cut through in that way, or whether they are axial and cut through the other way.

The claims of this patent No. 1,886,-246 read on Rothsten patent, No. 1,103,843, of July 14, 1914, and Wemp patent, No. 1,485,319, of February 26, 1924.

A still better and clearer reading is found in the patent to Willene, No. 1,-598,795, of September 7, 1926. All the claims of this patent read on Willene.

I also call attention to Burns patent, No. 1,646,897, of October 25, 1927. One of the clearer anticipations and on which the claims read very readily is the patent to Hawkins, No. 1,726,825, of September 3, 1929. Claim 1 reads readily on the patent to Richards, No. 924,937, of June 15, 1909. Claim 1 of this patent in suit also reads on Schull British patent, No. 19,131, of 1906. There is also the French patent to Compagnie, No. 414,788, of April, 1910, and these claims read on Ofeldt, No. 1,377,-849, of May 10, 1921.

Another patent that these claims read on is the patent to MacPherson, No. 1,-670,369, of May 22, 1928.

That is the patent which plaintiff says was assigned to some company at a time when there was no such corporation in existence, but that would not weaken it as prior art. There are very many sectional patents in the prior art. Some of these include flexible means for controlling vibration. There was no room for any one of these three claims at the time they were granted. They are all void and I reluctantly so hold.

This brings me to patent No. 1,907,-339 which was issued May 2, 1933. The application was filed November 1, 1924. This patent has but one claim.

This patent has a peculiar history. After it was filed there was long delay, and there was in the meantime an application for a patent in Canada, which was granted on the same disclosure. Then the Canadian patent was surrendered by the plaintiff. This patent was finally issued.

The specifications and the drawings show a device which is an eccentric balancer or dampener, but the claim is so broad that it reads as readily on a concentric as it would on an eccentric dampener or balancer. In testing its validity, I must do so on the basis of the broad interpretation of the claims for which plaintiff contends.

In doing that, I call attention to the patent to Ricardo, No. 1,342,648, of June 8, 1920. As I interpret the Ricardo patent, it is just like this patent, No. 1,907,-339, in suit, except that Ricardo had one high spot instead of two high spots for the purpose of moving the inertia or balancing mass. There would be no invention in this change. Some one might now make three. When Ricardo had one high spot, a shaft, a hub coming around the shaft and moving the inertia mass which was held against the hub and moved by it, he had all that is included in this claim. Ricardo had the same idea of balancing or dampening that is disclosed in this patent No. 1,907,339 here in suit. The patent in suit has a spring, where Ricardo had a metal toggle balance, or joint, but these differences are mechanical differences only and may be found as equivalents in almost all the different arts.

There are two patents to Edwards that came together and are enough to defeat this claim of plaintiff's patent No. 1,907,-339.

Edwards first filed one application and then divided it into two. They bear consecutive numbers and their filing dates are the same and the issue dates the same, Edwards, 1,738,876, issued December 10, 1926, filed May 23, 1924, and Edwards, 1,738,877, issued December 10, 1929, filing date May 23, 1924.

Edwards patent, No. 1,738,876, had two high points, so that is added to what I have said about Ricardo. Edwards shows two high spots on the actuating cam, and Edwards had the spring, so he had in that patent the little things which were lacking in Ricardo. Everything in the patent in suit, except the levers, are found in Ed-

wards patent, No. 1,738,876. When I come to the next patent to Edwards, we find the levers present, but there are no springs. The two Edwards patents were filed in the Patent Office together and went through together and I think they should be put together for the purpose of considering the prior art.

We should have in mind that these levers are so balanced with the mass on the outer end and pivoted in such a way that the other end comes against the high spot on the cam. In other words, gravity alone, if the engine were running slowly, would hold the end of the lever against the revolving cam with the high spots on it. When it goes fast, it is possible that gravity alone wouldn't do it, and plaintiff here in the patent in suit has added the spring under the end of the lever to help. Plaintiff has gravity pull on the outer end of the lever to hold it against the revolving cam with the high spots in it, and he puts in a spring to assist gravity. That is a very common thing to do in mechanics.

During the trial, plaintiff stated that his devices provided motions in different directions. In the prior art, we find that this resilient circumferential movement is common and old, and we find also both an axial and radial movement of the parts limited or checked by metal. Within limited range there is opportunity for the universal motion urged by plaintiff. No one of these three patents or any of the claims under these three patents shows anything new over the prior art, and the most one can say is that possibly there are some things not claimed that were new. As to such new features, the claim therefor should have been very narrow. The prior art was and is such that broadly the matters defined by these claims had been known long before the dates of plaintiff's applications.

■ Patent No. 1,982,151 relates to an internal combustion engine.

There are seven claims in this patent.

The only elements in the claim that are suggested as being new are the double dome in the head and the gutter around the valves for collecting any fuel that may condense and become liquid.

Again, if there is anything new or novel in this patent, it is not claimed. It is suggested by plaintiff that other cylinders do not explode gas by having the spark plug in the center of the head the way he does, and that the direction of travel of the gases is different, but these things are not a part of his claims. Claims for something previously shown in the art cannot be held good just because there is something else shown in the specifications and drawings.

Many times during the testimony in distinguishing between his patent and some patent in the prior art plaintiff has pointed out to me a difference between what he shows and what the prior art had shown, but when we get down to the thing claimed it is the same old thing shown in the prior art.

There are many double domes in the prior art.

Everything claimed by this patent in suit, except the gutter, is found in Hill, No. 1,692,339, of November 20, 1928. I have very grave doubts if that would leave a good claim even if there were no gutters shown in the prior art, as the gutter is not shown to be necessary to make a good engine.

Hill really has a gutter, but it is in a different place from that shown by plaintiff.

From the proofs here, both from plaintiff and the expert for the defendant, I take it that the place where these vapors are most likely to collect and turn into liquid is on the head of the piston.

Hill had this thought because he shows a hollowed piston head for the purpose of collecting the gas at the top of the piston head, and he really made a gutter of it, because he had it high in the middle and then sloping in such a way as to make a little trough that ran right around in the head of the piston. One could very well call it a gutter, and there is no importance attached to the particular name used. Hill had the idea of thus catching any liquid in the cylinder.

It is testified to and not disputed that the other parts of that cylinder are cooled by water on the other side of the casting, and that the temperature of such parts was about 180 degrees Fahrenheit. The under side of the piston head is cooled by the oil, and is much hotter, than other parts of the engine. Therefore the hottest place in the engine and the best place to vaporize the liquid would be the piston head. With Hill having the idea of the double dome, and having the idea of catching this vapor that turns into liquid into a gutter on the piston which is the hottest

**392**

point in the chamber, I find that Hill entirely anticipates the claims of patent No. 1,982,151.

Then there is the patent to Ogden, No. 1,577,806, of March 23, 1926. That has two cavities and in considering the gutter we ought to take Ogden into account. The patent in suit does not have a hollowed, guttered piston head like Hill, but the patent shows a piston with a flat top. Any drops of fluid which get on top of the piston, will run off and as they run off there is a little slope down to the gutter which really encircles the valve heads. If we assume as claimed by plaintiff that this is a hotter point of the chamber, and therefore more desirable, we should take into account that Ogden made the top of his piston head perfectly flat so that these little drops which accumulate there will run off just as readily as they do in the patent in suit, and that he raises his piston head above the regular walls of the chamber, and tapers off the edge of the piston so that the liquid flows off and down to the motor block the same as in the patent in suit. Ogden thus shows a construction in which a little gutter is provided. Whether he made it for that purpose or not, there is a groove around the valve head where these small amounts of fluid would surely collect, the same as they do in the patent in suit.

The patent to Bullington, No. 1,897,234, of February 14, 1933, issued on an application filed November 12, 1928, and is very much like Ogden. It is like it in the fact that the top of the cylinder head is flat, but it is not elevated as Ogden, but there is a boring for the valve head so that it makes a regular little trough for liquid.

The prior art had places to collect this little accumulation of liquid at the hottest part.

A patent should not be granted for saying, "I run a gutter around at a hotter place in the walls of the chamber than the others have done." It is difficult to prove which is the hottest place. Even the place of the gutter is old, but to change it would be the work of a mechanic.

Here, again, like in all these patents, the plaintiff claims that his real invention was in coupling these things up with a chamber in which he puts his spark plug in the center between the two domes, and the way he gets an explosion. The spark plug location and the place of explosion is not in the claims. That is the real difficulty.

My conclusion is that every claim of all four of these patents is void, as not showing anything new over the prior art.

These patents are confusing and very indefinite. The decree will be one dismissing the bill with costs to be taxed against the plaintiff.

This opinion may stand as my findings of fact and conclusions of law.