## GIBSON v. EASTERN RIM & WHEEL CO.

Circuit Court of Appeals, Third Circuit.
January 21, 1929.

Rehearing Denied May 1, 1929.

No. 3820.

The opinion of the District Court was as follows:

"This cause concerns letters patent No. 1,204,658, issued November 14, 1916, to Hugh C. Gibson, for an improved wheel. Claims 8 to 12, both inclusive, are in issue. The invention more particularly concerns such a construction of automobile wheels as that a tire may, with ease and quickness, be removed and replaced.

"The Motion to Amend.

"The defendant of record in this case is the Eastern Rim & Wheel Company. This is a mere selling concern. The real defendant may be said to be the Firestone Tire & Rubber Company, or its subsidiary, the Firestone Steel Products Company. The facts probably are that the last-named company does the actual manufacturing, but does it for the Firestone Tire Company, which in turn supplies the product to the record defendant and other concerns which do the selling. The amended answer frankly states these facts, and further that the defense is being conducted at the expense of the manufacturer through its own counsel. Counsel have with like candor made a like statement of their relation to the cause, but have made it clear that they appear here only for the defendant of record, or at least have entered no appearance for the other companies.

"We see nothing to be gained by allowing the amendment. If these other companies are made defendants ar codefendants, we could have no jurisdiction of the person of absent and unserved parties, but could deal with them only under Equity Rule 39 or as the court (acting by the then Judge Shiras) dealt with a similar situation in Eagle Mfg. Co. v. Miller (C. C.) 41 F. 357. We will in consequence assume this motion to be withdrawn, unless counsel for plaintiff shall press it further. We see nothing in it other than a skirmish for a position from which to get what each side thinks to be a tactical advantage in a later possible stage of this litigation.

"General Observations.

"There are two features of the general situation which provoke comment. One is that the automobile industry had its birth and early development in France. This is neither unusual nor surprising. The path of the progress of almost every art, science, and industry is strewn with monuments to the genius of the French. The learning of its men of science and the skill of its artisans and their contributions to everything of value which enters into the lives of peoples and of nations is attested and proved by the terminology and nomenclature of every art. Remove from it all which is known to us by a name which bespeaks its French origin, and there would be not much of value left. The other is a truth which comes to us with the shock of a surprise. It is that prior to 1909 or 1910 the automobile industry of the United States, the product of which now dominates the landscape and crowds every street and highway, was then far behind that of Europe. Until after 1906 every racing car in the United States was of foreign build and equipment. One of the most appreciated advancements made in automobile accessories is that made in tires. Punctured or otherwise deflated tires, now rare, were, in the early days exasperatingly frequent, and yet before 1906, at the very time when most needed, means for the quick and easy changing of tires were unknown. It was at this very time the plaintiff came to this country, and for him counsel now make the bold claim that it was through him and the invention with which we are now concerned that the industry in America owes this great advance. If this claim is well founded, he has a real grievance, for the use of the inventive thought, which he asserts to be his own, has yielded literally untold millions, of which he is yet to get the first dollar.

"The Claimed Invention.

"Counsel for plaintiff describes the invention to which claim is made as 'the use of a wedge-shaped, split, floating, movable, self conforming, flexible, automatically adjustable locking ring in connection with its adjuncts.' In such a wealth of adjectives, some are bound to be overlapping. The idea we get of it is that the plaintiff was the first to think of and to introduce the use of a strip of metal wedge-shaped, so that it could easily be forced into a stable position, and bent into the shape of a broken ring so as to hug closely the perimeter of a wheel to which it could be easily adjusted and from which readily and quickly removed. Expression and embodiment is given to the thought in the sketch known to this record as that of April 20, 1906, plaintiff's Exhibit No. 1. It will be noticed how emphatic and repeated is the reference to this so called 'split ring' feature. It was, of course, necessary for the plaintiff not merely to have conceived the in-

ventive thought, but to have what is called 'reduced it to practice,' before it had otherwise found a place in the art. It is this sketch upon which counsel for plaintiff and the inventor rely as 'his reduction to practice.'

"We assume that no fault will be found with us if we follow the path of logic to which counsel for plaintiff point us and which they have laid out for us. There was small choice left to counsel, because it is an admitted fact that the plaintiff's invention was never incorporated in a wheel for use and that no use was ever made of it except by those now charged to be infringers. No one, of course, can speak with positiveness of 'the might have beens,' but this record is filled with the probabilities that had not the defendant and others 'infringed,' the value of this invention must have been lost to the world, because the plaintiff himself did nothing with it. The plaintiff, it is true, made two wheels known to this record as the 'red' and 'black.' They were not made at the same time and were what are commonly called 'models.' Plaintiff does not rely upon them as reductions to practice, nor is the evidence of when they came into existence such as to make them available for any such purpose. The plaintiff relies, and with unshakable confidence, upon the April, 1906, sketch as his completed invention. An inventor must, however, do more than perfect his invention. He must within a prescribed time take the necessary steps to have his invention patented. The first step is an application. This was made by the plaintiff March 15, 1907, and this date thus for the time being became the date of his invention. We quote the plaintiff and his counsel in the assertion and acknowledgment that this date would not serve its purpose. It was necessary to carry the date of invention back of that of the application. The first date suggested was July, 1906. This was not thought (perhaps because of the Omnia publication of June, 1906) to be early enough, and happily for the inventor, the April, 1906, sketch which had been mislaid turned up with a date of April, 1906, which is asserted by the plaintiff to be early enough to anticipate all rivals. We are following the argument of counsel for plaintiff in regarding the establishment of this date as vital to the case for the plaintiff. Any one who seeks to carry the date of an invention back of the filing date encounters a doctrine of the law which has behind it a well-established and indeed necessary policy.

"There is no need to cite the authorities in its support, to many of which we have been referred; but we give a few. Thayer v. Hart (C. C.) 20 F. 693; Westinghouse Electric & Mfg. Co. v. Mutual Life (C. C.) 129 F. 213; Safety Gas Lighter Co. v. Fischer Bros. (D. C.) 236 F. 955.

■ "The convictions we have of truth are of varying degrees of strength. All are familiar with the difference in strength of conviction which will support a finding in a civil case and that which is demanded in the courts of criminal law. Equity employs a phrase to describe the character of evidence called for to establish a fact before the chancellor will, in some instances, be moved to act. Such evidence must be 'clear, precise and indubitable.' This is part of the verbiage of the law, but the meaning is that the conviction of the truth of what is to be found must in certain cases have a firm and unshaken seat in the mind which must rest in satisfied content with it. This is the kind of a conviction demanded before the date of an invention can be established otherwise than by the application for a patent. As a corollary, oral testimony to fix the date of an invention must have (unless the conditions are exceptional) corroboration in evidence which is in its nature inerrant. The testimony must carry conviction of its accuracy in the fact sense, not merely of its truthfulness in the ethical sense. The value of this policy and doctrine of the law is emphasized when the interval between the date of the testimony and that to which it relates is great. Here the interval is over 21 years. Such testimony is proverbially unreliable and undependable. The illustrations of this truth are many. There is no man on the sunset side of middle life who would not testify, with absolute confidence in the accuracy of his observation and memory, that the winters of his childhood began sooner, lasted longer, and were attested by deeper snows and thicker ice than the winters of his manhood. There is one disturbing thought to the acceptance of such testimony. The father and the grandfather and the great-grandfather of the witness made the like comparison with the days of their youth, and hence the conclusion reached must be that a few generations ago polar weather prevailed in this latitude the year round. The law listens to such testimony, but before crediting it requires that it be supported by the statistics of the Weather Bureau.

"Counsel for plaintiff boldly challenges the application of this test and plants his whole case upon the proposition that the sketch of April, 1906, is a full and complete disclosure of the invention and what he calls its 'reduction to practice' as of that date.

"We are asked to find, and without hesitation do so, that there was nothing in the developments of the trial which would justify any distrust of the integrity of any of the witnesses. With this finding made, counsel supplements it with the grant of letters patent and reaches at once the assured conclusion that the validity of the claims in issue has been established. The simplicity and compactness of this argument is due to the fact that it rests upon the sketch of April, 1906, and to the disclosure there of the 'split ring' element. The triumphant note sounded by counsel is that the wedged-shaped split ring is of the very heart and core of this invention and it is in the sketch of 1906 and in the wheel of the defendant. The very simplicity of this statement of the case for the plaintiff excites a flood of questions, the answer to no one of which leaves a satisfying impression upon the mind. If this sketch of April, 1906, is a complete disclosure of the invention from which a wheel might be made, why was it not made the basis for the patent application of 1907? The answer in part is that the sketch had been mislaid. This answer is not satisfying. There is no very clear statement of whether the wheel of this invention (other than the Vinet wheel) was in use in England earlier in 1906. Such foreign use would by statute not be an obstacle to the grant of a patent here, but some inventive thoughts come to the inventor in a flash, and the Minerva-like completeness of this invention may be the fruit of a like happy thought or be due to the fact that the plaintiff brought the idea of it with him to America. The fact at all events is that he had it so firmly and clearly in mind that he made this sketch offhand and at a stroke. If he could do this in April, 1906, why could he not reproduce it when he filed his application? Why then was the mislaying of the paper in this respect of any consequence? Again, if the idea of this invention had been perfected in 1906, why were claims based upon it not formulated and incorporated in the application as they now are, and why is it that the claims now in issue were not formulated, one until 1913, and the others not until 1914, seven and eight years after the application was filed? Still again, if the 1906 sketch is as complete a showing and embodiment of the invention as it is now claimed to be, why is it that the claims of the original application were rejected on the Vinet patent and this rejection accepted by the applicant without a word being said of the 'split ring' feature? One of three things would seem to be true. The 1906 sketch does not disclose invention as clearly as counsel now urge upon us, or the original sketch did not disclose all that it now shows, or the Vinet patent was read to include a split ring. Still again, this invention was perfected as now claimed in 1906; the application was filed March 15, 1907, but no letters were taken out until November 14, 1916, an interval of ten years. No explanation of this long delay is attempted. This would be difficult to explain under any circumstances, but under the prevailing conditions explanation consistent with the present theory of an April, 1906, perfected invention is impossible. These conditions were that the demand for these demountable tires after 1906 and 1907 went on by leaps and bounds. By 1909 and 1910 and thereafter those now charged to be infringers were, to the knowledge of this plaintiff and his advisors, taking in year after year profits of millions upon millions, as we are now told, and yet this plaintiff sat still for more than nine years and saw this stream of wealth flow past him without stretching forth a hand, when all he had to do, as his counsel now claim, was to do as he now does, hold up in one hand the sketch of 1906 and in the other the structure of the Vinet patent showing no split ring and demand the grant to him of a patent, as he now demands a decree in his favor. Again, we are forced to say that either the sketch of 1906 is of less evidentiary value than it is now urged upon us to be, or we cannot accept the recollection of witnesses who testify in 1927 that a sketch made in April, 1906, was then what it is now. All possible emphasis and value is now given to the broken or split ring element in the combination which describes this invention. It, as before remarked, figures not only prominently but repeatedly in the 1906 sketch. The query cannot be suppressed, if like importance was given to this feature during the pendency of the application, why, when the claims of the application were rejected on the Vinet patent, differentiation was not made on this ground, and why in the very claims in issue a broken or split ring is not mentioned, but a band which would cover a ring broken or unbroken? It is now confidently asserted that the Vinet patent discloses no broken ring as does the sketch of 1906 (and in this we agree with the plaintiff), and it is on this ground that the invention of the 1906 sketch is claimed to have been unanticipated; but the disturbing thought is that the file wrapper discloses no such importance given to this feature as now given. It is true that the application of March, 1907, discloses a split ring, but so

likewise did the prior publication of June, 1906. This throws light on the importance now given to the sketch of April, 1906.

"We further have the final fact that it was not until 1925 that the first legal steps were taken to enforce the claimed rights of the plaintiff. To summarize these dates, we have an invention in 1906; patent application March, 1907; claims now in issue not formulated until 1913 and 1914; patent not taken out until November 14, 1916; and no action taken against infringers until October, 1925. This case was heard in 1927, 21 years after the invention and 11 years after the grant of letters.

"We are not unmindful of the explanation given, and the explanation is one which is always directed to a sympathetic ear. It too often occurs that inventions, which have a value so great that language cannot convey a real sense of it, have yielded to the inventor no more than a pittance, simply because he was financially unable to get from them their yield. Financial inability to do anything with an invention is too common to excite comment. The owner of this valuable idea, however, was in touch with automobile manufacturers of England. His counsel makes for him the proud boast that he had made almost the very first automobile which had ever run over English roads. He was a member of the second largest Association of Mechanical Engineers in England and an associate member of the Institution of Electrical Engineers located in London. Immediately almost upon coming to this country he became a member of the Association of Licensed Automobile Manufacturers and rendered service as an expert in the famous Selden patent litigations; he was likewise consulting engineer for a number of automobile manufacturers and the chief engineer of another having a large force of other engineers, draftsmen, testers, etc., under him.

"We are quite in accord with counsel for plaintiff that there is no necessary relation between money gathering and brains, and that there may be either without the other; but we have thus culled from the deserved tribute paid by counsel to client, not to show that he must have accumulated a store of money, but that he must have known and fully appreciated the commercial value as well as the mechanical worth and merit of his invention and must have known of the extensive unauthorized use of it. Lack of funds would explain his delay in locking horns with powerful infringers, but would not explain the delay of nearly 10 years in taking out letters patent. On the contrary,

the very plentitude of the rich harvest in prospect would be supposed to appeal more strongly to one in need. The further fact disclosed is that he was in close touch with those whose business gave them a deep interest in the subject and who had the facilities for getting such work done, and yet not a single wheel embodying his invention was ever made. This places him in the weak position of being not only the holder of a mere paper patent, but one whose validity is dependent upon the accuracy of a more than 21 year old recollection of what was at the time no more than a casual incident. We have every sympathy with an inventor who has arrayed against him great and powerful interests. We have every willingness to listen and to understand on what he bases his claim of right and in what he has been wronged, and every inclination when convinced to vindicate his right and to grant redress for the wrong. Because of this, we have given much more than the usual consideration to the feature of the case, which we have discussed at what is doubtless undue and tiresome length.

"As we grasp the thought of the experienced counsel who have prepared and argued his case, it is that the pivoting point in the case and the keynote of the argument is the 'split ring' element in plaintiff's combination. There are, of course, other elements of value, but it is upon this he rests his claims. It is a reiteration to mention that this 'split ring' feature was in the literature of the art as early as June, 1906. The application, we repeat, was filed March 15, 1907. This feature had then been anticipated, unless the date of invention could be pushed back to an earlier date. This means that a finding that the date of the invention was that of Exhibit No. 1 is essential to a decree in plaintiff's favor. This finding we cannot make. We phrase this finding in terms as favorable to the plaintiff as can be made. We do not find that this was not the date of the invention, but we do find that after the great lapse of time, and in view of all the surroundings of the incident of the April, 1906, sketch, we are unconvinced of the essential fact in question with that degree of certainty which the law requires.

"A part of the argument for the defense is that the Vinet patent discloses a split ring. Counsel for defendant have presented the argument in the form of what they deem to be the equivalent of a demonstration in synthetical geometry. No unbroken ring or band can he commercially make to serve the purpose of this interlocking ring. The sim-

ple and well-known expedient to make it practical is to break the circle, or to make of it what is called a 'split ring.' The plaintiff himself, when differentiating his wheel from what he understood to be the wheel of the Vinet patent, condemned the latter to be utterly beyond the pale because it lacked the 'split ring' feature. Split rings themselves were old in the art. The argument in consequence is that any mechanic would know that a 'split ring' must enter into the Vinet combination. We do not yield to the logic of this argument. It may prove that the Vinet wheel could not be made on a commercial basis without the use of a 'split ring,' but it does not prove that Vinet had in mind or disclosed a split ring. He certainly does not disclose it. One trying out his wheel might discover that the use of a split ring gave it practical value, but, if so, the discovery would be owing to no hint given by the Vinet patent. The Omnia publication of June, 1906, gives emphasis to this.

"In view of the already overlong length of this opinion and that the plaintiff rests his case upon April 20, 1906, as the natal day of his invention, we see no need to go into the other features of the defense, one of which is that with credit given to Vinet for the 'split ring' feature or its being out of the case, the plaintiff in order to charge the defendants with infringement must encounter anticipation by Vinet, or if the latter is escaped by a more narrow construction of the claims, then the defendant is acquitted of infringement. These and other like questions we leave to those who enjoy struggling with mechanical problems.

"A decree dismissing the bill for want of equity, the letters patent being invalid because of the absence of invention due to a lack of novelty, may be submitted, carrying costs against the plaintiff, with leave to add such special findings as either party may desire."

E. Hayward Fairbanks, of Philadelphia, Pa., for appellant.

Charles Neave, of New York City, Albert L. Ely, of Akron, Ohio, and Benjamin O. Frick, of Philadelphia, Pa., for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and THOMSON, District Judge.

PER CURIAM. The underlying question in this case was the validity of the patent involved because of the novelty of its alleged invention. No principles of law are involved.

The court below discussed the questions involved with unusual detail and thorough-ness in an exhaustive opinion. The court has had the benefit of an equally thorough presentation of the case by counsel for plaintiff in oral argument and comprehensive brief, but such presentation and our own study of the record fails to convince us the trial judge was in error. In view of his able opinion, and finding ourselves in accord therewith, we adopt it as expressive of our view and limit ourselves to affirming the decree based upon it.