**S. S. KRESGE CO. et al. v. WINGET KICKERNICK CO. et al.**

**J. C. PENNEY CO., Inc., et al. v. SAME.**

**LA MODE GARMENT CO. v. SAME.**

Nos. 10818–10820.

Circuit Court of Appeals, Eighth Circuit.

May 16, 1938.

George I. Haight, of Chicago, Ill. (John J. Sexton, of St. Paul, Minn., and John A. Marzall, of Chicago, Ill., on the brief), for appellants.

Frank A. Whiteley, of Minneapolis, Minn., for appellees.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

Mary D. Neilson was granted patent No. 1,389,067 covering "Undergarments for Women". She was also granted patent No. 1,680,267 which she thereafter surrendered upon Reissue No. 17,903—this patent being for "Process of making garments for women and children." Thereafter, she gave an exclusive license to Winget Kickernick Company to make, use and sell under these patents. Also, the Winget company is owner of the registered trademark "Kickernick" as applicable to garments manufactured by it.

January 29, 1935, Mrs. Neilson and the Winget company filed a suit against S. S. Kresge Company and another suit against J. C. Penney Company, Incorporated. In each of these suits plaintiffs sought an injunction against infringement of the above patents and of the trademark and against unfair competition and for treble damages for wilful infringement and for damages for unfair competition. November 15, 1935, La Mode Garment Company (manufacturer of the garments sold by the defendants in the above two suits) brought suit, in the same court, seeking to enjoin further prosecution of the two above actions.

These three suits were consolidated for trial. In each of the infringement actions a decree was entered enjoining the defendant and the La Mode Garment Company from further infringement of the patents and the trademark, according recovery of profits and damages from them and referring determination of the amount of profits and damages to a special master. In the action brought by the La Mode Garment Company, a decree was entered dismissing for want of equity. Separate appeals were taken from these three decrees and the appeals consolidated and heard upon a single record.

We shall first examine and determine the issues concerning the patents and, thereafter, those concerning the trademark and unfair competition. We shall examine these patents separately.

Product Patent No. 1,389,067.

Patent No. 1,389,067 is a product patent. Claims 1, 2 and 5 are here involved. Those claims are as follows:

"1. A woman's undergarment comprising a back member having the central portion of the bottom edge concavely curved throughout its length, a front member having its center cut along a straight line a predetermined distance, and an insert sewed along one edge to the edges of said central cut and along another edge to the curved edge of the back member.

"2. A woman's undergarment comprising a back member having the central portion of the bottom edge concavely curved throughout its length, a front member having its center cut along a straight line a predetermined distance, and an elongated rectangular insert sewed along one longitudinal edge to the edges of the center cut and along another longitudinal edge to the curved edge of the back member.

\* \* \* \* \* \* \* \* \* \* \* \* \*

"5. An undergarment comprising a back member having side edges and a bottom edge formed with a straight portion extending from and angularly disposed in relation to each of said side edges and having a portion between the two straight portions concavely curved throughout its length, a

front member having side edges connected with the side edges of the rear member and having increased width of material extending inwardly from the lower portion of the median line of said front member, said increased width of material having a continuous edge connected throughout its length with the curved edge only of the back member, whereby leg members of the garment are formed with crotch fullness extending directly back from the median line at the front of the crotch between said leg members."

Claims 1 and 2 cover a garment made up of three pieces which are a back member, a front member and an insert. The claims differ only in the respect that claim 2 describes the shape ("elongated rectangular") of the insert while claim 1 does not. Claim 5 covers a garment made up of two pieces: a front member and a back member.

Appellants challenge both the validity of the patent and infringement thereof, if valid. We think there was no infringement of the patent and, therefore, there is no necessity for determining validity. Our examination is limited to the scope of the patent in order to ascertain whether the accused garment is within that scope.

We have spent much time and effort in digesting this large record of more than eleven hundred pages and in examination and comparison of many physical exhibits. From this study, certain matters concerning this art, its development and its status at the time of this patent are clear.

The immediate art is women and girls' drawers and bloomers. A correlative art, close enough for citation here, is that of men's drawers and pants. The art has to do with particular garments covering the body from the waist down and more or less of the legs. It is an undergarment fitting next the body. The problems of the art have to do with the use of such garments. Bearing upon that use are the material used, the freedom of movement, the wear of the garment, economy in manufacture and styles of clothing.

At the time this record opens the history of the art, its status was as follows. The material was inelastic, such as muslin. This material came in bolts of flat cloth of regular widths. From such material, the drawers were cut in various number of pieces. Usually, there were four pieces (two back and two front) or two pieces (back and front or two side halves). Where there were four pieces there were seams on the outsides and insides of the legs and (where the crotch was not left open) from front waist center between the legs to back waist center. Where there were two pieces (back and front) the seams were on the outsides and insides of the legs or (where the two pieces were side halves) along the insides of the legs and from front to back waist lines through the crotch. Where the crotch was left open, the above seams terminated so as to have that result. Where the crotch was closed, the above constructions resulted in a V-shape at the crotch. Such garments lacked conformation to the body and more or less restricted body and leg movements. This restriction caused discomfort and also strain upon the garments, particularly at the seams which were the weak places. Only partial relief was obtained by having the crotch portion of the garment hang low and loosely.

The development from the above garments was directed along several lines as follows. One of these had as its prime purpose the strengthening of the garment at places of stress so as to give longer wear. There were two places of particular strain —caused by body and/or leg movements— these were across the seat and at the crotch. This strain manifested itself mainly at the seams which were usually the weaker places. Hence, this line of improvement took the forms of strengthening the seam by putting over it a reinforcing piece (Mandel patent No. 235,888 and Pearson No. 281,790, also see Loewenstein and Van Baalen No. 241,871) by inserts or gussets at the crotch or in relation to the seat (Howe No. 117,-885, Evans No. 236,012, Loewenstein and Van Baalen No. 241,871, Bortree No. 250,-131, Tracey No. 298,322, Ensminger No. 298,360, Gaston No. 317,334, Kneip No. 405,262, Lowe No. 430,532, West No. 453,-874, Scriven No. 590,595, Scriven No. 690,-195, in some patents this strengthening feature was incidental (Johnson No. 850,013, Page No. 1,069,073). Another was primarily directed to economy of manufacture, which manifested itself through efforts to economize in cloth by cutting along certain patterns and, also, to lessen the number of seams (Tracey No. 298,322, Erlanger No. 423,139, Lowe No. 430,532, Hamilton and Lewis No. 478,281, Corin No. 592,696, Lewis No. 621,353, Johnson No. 850,013, Wheeler No. 852,364). Another was primarily directed at appearance or style (Royce No. 553,739) or protection of other

clothing (Prindall No. 1,102,800). Another was directed at comfort (Howe No. 117,885, Pearson No. 281,790, Tracey No. 298,322, Gaston No. 317,334, Kneip No. 405,262, Scriven No. 590,595, Morris No. 1,098,960, Clausen No. 1,198,108). Some of the above cited patents have had more than one purpose and the above arrangement of citation is merely illustrative. Other influences have been development of materials (such as elastics and knitted fabric) and styles of garments (such as union suits, abbreviated, closs-fitting dresses and use of bloomers as an exterior garment). While there have been various purposes guiding inventors and various influences bearing upon and changing the course of development of this art, each of them has made its contribution. The result is, that when Mrs. Neilson entered it, it was a somewhat developed and crowded art—all of the patents above cited are prior to her earliest patent, they extend from 1871 to 1916.

Mrs. Neilson entered the patented art in 1916 with an application which passed to patent (No. 1,281,058) in 1918. This garment was an "undergarment" designed for use by women and girls. There were several forms—one was drawers and the others were body covering as well, the drawers feature being substantially the same in all. Her expressed main purpose was comfort. This she sought to secure by a garment which would "comfortably fit the body of the wearer in any position to avoid drawing or pulling, particularly at the crotch." These drawers were to be made from either three or four pieces of "inelastic material, such as muslin." There was a front member of two pieces and a back member of either one or two pieces. The front member pieces were to be cut so that the front member would "hang flush or straight when in use." The back member "is cut large and full" gathered at the proper places on the seams joining the front member. This gave a "large amount of fullness" across the seat "thus giving perfect freedom in any position of the wearer whether sitting, standing or bending over, and preventing any drawing or pulling at the crotch or across the seat." As we shall hereafter see, while this attempt to secure comfort by conforming the garment to the body to prevent the discomfort of strain was a step to that end it did not completely take care of the entire situation. In so far as movement of the body and forward and backward movements of the legs it might well be successful. As to movement separating the legs sideways, it offered little or nothing. That further step was taken in her later patent, now under examination.

There was nothing new in the conception that comfort was to be secured by conforming the garment to the body (Pearson No. 281,790, Wheeler No. 852,364, Clausen No. 1,198,108) or in a back member made large and reduced at the side seams as a means to that end (Pearson No. 281,790). Pearson's method of reduction is by side seam gathers as in this Neilson patent (No. 1,281,058).

The next patent of Mrs. Neilson is No. 1,389,067, now under examination. This patent expressly had to do with "inelastic material, such as muslin or nainsook". Mrs. Neilson was still proceeding along the premise of her earlier patent that the garment conform to the body and its movements. Her declared purpose was a garment "which shall fit the wearer no matter what the position of the body without any strain or tension at any point." Her method of securing the result was by a garment of three pieces: back member, front member and rectangular crotch insert, each of a defined description. "Substantial fullness is produced by the combined effect of making the back portion of the garment longer in amount of material than the front portion and gathering the edges of the back portion to the edges of the front portion in combination with the provision of a rectangular insertion sewed directly to the center cleft edges of the front member and the curved bottom edge of the back member, whereby the two portions are united to form legs and at the same time provide a substantial depth of material at the crotch."

A comparison of this patent with her earlier patent shows the main differences are those resulting from the introduction of the new member (the insert). This has caused a different cut of the front member and a less difference in cut of the back member. It is distinctly an advance though it retains the prime feature—fullness at seat—of the earlier patent. Also, it is a better garment as, in addition to the advantages of a full seat, is has added freedom of movement sideways of the legs which was absent in her earlier patent. This has been brought about by introduction of the crotch insert.

A crotch insert is old in the art (Howe No. 117,885, Evans No. 236,012, Loewen-

stein and Van Baalen No. 241,871, Bortree No. 250,131, Ensminger No. 298,360, Gaston No. 317,334, Kneip No. 405,262, Lowe No. 430,532, West No. 453,874, Hamilton and Lewis No. 478,281, Scriven No. 590,595, Lewis No. 621,353, Scriven No. 690,195, Johnson No. 850,013, Gould No. 884,815, Page No. 1,069,073, Morris No. 1,098,960, Kelly No. 1,106,310, Clausen No. 1,198,108, Boltz No. 1,277,841). These inserts have had various purposes, such as strengthening, comfort or health. They have been of different materials, such as inelastic, elastic, and ventilated. There has been a diversity of shapes, such as triangular, diamond, lozenge, heart and others. But whatever the purpose, material or shape, one result has been to affect the freedom of movement and, therefore, the comfort of the wearer.

The straight hanging front is expressly covered by the earlier patent of Mrs. Neilson No. 1,281,058, now expired.

From what has been said heretofore, it seems clear that this patent (Neilson No. 1,281,058) entered an art which, if not crowded, had at least received much patent attention. Her general conception of a form fitting garment was not new. Each of the three elements of her garment had been used for, or so that it performed, the same general purpose as intended by her. A study of the earlier patents makes evident that any patentable advance by her must be confined to the particular elements, having regard to their shape and place in the garment, and to a somewhat narrow range of equivalents. It is true that a mere combination of all or parts of such elements or a mere separation of an element into pieces would not avoid infringement. On the other hand, every garment which might reach the same results as her garment would not necessarily infringe. Her patent reaches certain results in a certain way. In view of the art, she could not patent the result so as to preempt such result no matter how attained. Where an accused garment reaches the same result, infringement hangs on the manner in which such result was attained.

While much that has been stated above is applicable to all of the three claims here involved, some of the statements more directly concern claims 1 and 2 which are three piece garments. Claim 5 is for a two piece garment. This claim is not as clear as it might be. There is some question as to whether one skilled in the art could follow it and make a garment. In the description of the back member, it is not clear what is meant by "with a straight portion extending from and angularly disposed in relation to each of said side edges." In the description of the front member, the expressions concerning the "increased width of material" seem indefinite. Neither drawings nor the specifications resolve this uncertainty or explain what is meant. Seemingly, the claim covers a two piece garment where extra fullness in the front piece is carried back through the crotch. If this be the proper construction of the claim, there is some similarity in Hamilton and Lewis No. 478,281, where a crotch piece is cut integral with the back member.

Having endeavored to indicate the scope of the Neilson patent, we next examine the accused garments to determine whether or not they infringe. While some earlier garments of appellant were made from inelastic material, those here accused are from rayon. Rayon is a woven fabric characterized by considerable elasticity. It is woven in tubes from seventy-five to one hundred yards in length. From these tubes the patterns must be cut. Clearly, the elastic qualities of rayon cannot be ignored for it is evident that the problem of relieving strain—which is the problem of comfort—is affected by use of an elastic or of an inelastic material. This is illustrated by numerous patents employing and emphasizing the use of elastic materials (Scriven No. 590,595, Kelly No. 1,106,310, Clausen No. 1,198,108). On the other hand, a structure adapted to relieve strain where inelastic material is used is not avoided merely because elastic material is used. The structure is the important matter and the difference in materials here does not seem to have influenced the structure or pattern used by appellant.

The form in which the rayon comes—in tubes—seems to have had an effect. The tubes were not so wide as the bolts of muslin and other inelastic material. This difference was important from the manufacturers' view because it involves the use of patterns which would make the most of the yardage.

Having adverted to the matters of differences in material and in form of the goods, we turn to the structure used in making the accused garments. These are four piece garments. There are two side pieces of full garment length which are joined at front and rear body center. At the medial front center, a piece is cut out for a short distance from the bottom. The shape of

this piece is such that, when the side pieces are joined in front, the cut-out space is an inverted and elongated U. The two other pieces are inserts. One is a relatively large arrow-head shaped insert. This is attached to the back edges of the side pieces. The point meets the back seam of the side pieces an appreciable distance below the waist line. The side edges of the arrow-head are attached to the back edges of the side pieces and extend down the length thereof. The bottom edge of the arrow-head is attached to the other insert along the middle portion of the length thereof. The other insert is an elongated rectangular piece attached on its front side to the cleft portions of the front below the seam and on its back side to the lower edge of the other insert and, for a short distance near the ends, to the lower edge of the back portions of the side pieces. The ends of this insert form a small portion of the bottom of each leg. The present structure of appellants differs from the accused only in that the two side pieces are cut as one piece and joined in front with a seam.

Points of similarity of the patent garment and the accused garment are as follows. Both are body conforming. Each has a full seat and an easy crotch. Both secure the easy crotch by use of an elongated rectangular insert which is similarly located in the garment.

Points of dissimilarity are as follows. There are no back and front members in accused. Such members are necessary in the patent because the seat fullness is there secured through the cut of the back member (as to shape and as to size relative to the front) and by side seam gathers of the back member where it is joined to the front. The patent teaches no other way to secure seat fullness. In the accused, there are no gathers and none are possible. There the seat fullness is secured solely by the arrow-head insert. The patent cannot be construed to cover this insert used for this purpose because such was old (Bortree No. 250,131, Kneip No. 405,262, Lowe No. 430,-532, West No. 453,874).

The two important strains to be taken care of in a pair of drawers, bloomers or pants are the seat and the crotch strains. The patent seeks to care for both of these— each in a described way. The accused garment does the same. Each takes care of the crotch strain in the same way, that is by an elongated rectangular insert positioned in practically the same place in the gar-

ments. The seat strain is taken care of by entirely different methods. The use of a crotch gusset is, as shown above, old. The use of an elongated rectangular crotch gusset located as here is old (Scriven No. 590,-595, Lewis No. 621,353, Scriven No. 690,-195, Johnson No. 850,013, Gould No. 884,-815, and for elongated inserts almost rectangular see Morris No. 1,098,960 and Boltz No. 1,277,841). When we consider the general state of the art, the art as to the particular features and feature functions of the patent, and the structural differences of the patent and the accused garment, we must conclude that there is no infringement of this patent.

### Reissue Patent No. 17,903.

This patent is a reissue of Neilson No. 1,680,267. It covers "Process of making garments for women and children." While it covers a garment combining a body covering above the waist and hanging from the shoulders with a drawers, the entire novelty is expressly stated to be only in the drawers portion. Claims 1 and 4 are here involved. These claims are as follows (the differences in expression are indicated by inserted parentheses).

"1. The process of making undergarments which consists in providing a front part and forming therein a division starting at a point in the longitudinal center line of said front part adjacent the front of the crotch, providing a back part having excess length of material at its central portion which along its center line from the waist-line to the bottom is substantially double in length the distance from said starting point along the center line of the front part to the waistline of the garment, forming said back part with (a central bottom edge portion) double the length of each edge of said division, uniting said back part along its side edges to the side edges of said front part, and attaching said central bottom edge to the edges of said division with the center of said bottom edge at said division starting point, whereby legs are formed with crotch fullness extending directly back from the center of the front of the garment.

\* \* \* \* \* \* \* \* \* \* \* \* \*

"4. The process of making undergarments which consists in providing a front part and forming a division starting at a point in the longitudinal center line of said front part, adjacent the front of the crotch, providing a back part having excess length of material at its central portion which

along its center line from the waistline to the bottom is substantially double in length the distance from said starting point along the center line of the front part to the waistline of the garment, forming said back part with (symmetrically positioned edge portions at the lower sides of the bottom thereof to form bottom edges of the legs of the garment with a bottom edge portion between said last named edge portions which is) double the length of each edge of said division, uniting said back part along its side edges to the side edges of said front part, and attaching said central bottom edge to the edges of said division with the center of said bottom edge at said division starting point, whereby legs are formed with crotch fullness extending directly back from the center of the front of the garment."

As matter of essence, the claims differ only in one detail which is (claim 4) in "forming said back part with symmetrically positioned edge portions at the lower sides of the bottom thereof."

Broadly, the contention of appellees is that these claims cover any construction where a back piece, having a center portion (from waist line to bottom) substantially double the length of the front piece (from waist line to crotch division), is united to a front piece having a division starting in the longitudinal center of the front (adjacent the front of the crotch), so as to form legs "with crotch fullness extending directly back from the center of the front of the garment."

Applying this general contention to the situation here, the argument is as follows. As to the front piece, it is urged that there is no limitation as to the nature of the division in the front of the garment—it may be a straight cleft, a V-shaped cleft or a straight sided curved top cleft (as in the accused garment)—and that the front does not embody increased width applied to the front, as a crotch insert. As to the back piece, it is urged that it does not require any cut-out portion of the bottom, such as a

V or a curve, but may be of any form which will, upon union with the front piece, form legs with crotch fullness extending directly back from the center of the front; that it is immaterial whether the back piece is single or is made up of more pieces of various shapes, provided upon union with the front, they extend directly back from the front crotch opening. As to the union of the pieces, it is urged that such is not required by side seams or any particular seams but union may be by weaving or knitting of the material—as where a rayon tube is used or where material is cut off a whole piece and secured along the center of the front. As to the union of the central bottom edge of the back with the divided crotch edges of the front, it is urged that this covers a crotch insert where such insert is first sewed to the back thereby becoming a part thereof.

When the prior art (discussed above in connection with the product patent) is considered, it is clear that these contentions of appellees cannot be accepted to the full extent urged. While a mere cutting of the back piece into two or more pieces and then sewing them together would be within the claims, yet where the same result is reached by the use of various pieces, each of which is used for a definite purpose and each having its particular effect upon the resulting garment, a different answer must be given. This patent does not cover a result but the means of obtaining a result. The described process consists of a method describing the way material shall be cut and the way it shall be joined to accomplish a result.

In the patent itself and throughout the file wrapper on this reissue, repeated emphasis is placed upon the relation of the back and front measures as to length. This relation is that the center line length of the back piece from waist line to bottom shall be "substantially double in length" of the center line of the front piece from the waist line to the front of the crotch. The basis of the reissue was to make this relation of lengths definite.[1] The range of the qualify-

---

[1] In the supplemental oath of applicant Neilson appears the following:

"Claims 1, 2 and 4 of the original patent which it is here sought to have reissued, attempted to define that relation by asserting the provision of a back part,—

" 'having excess length of material at its central portion extending below the bottom edges of the front part before the lower portion of the back part has been sewed into the garment.'

"Applicant is not seeking to claim in this reissue any different invention from that which the above-quoted language of the patented claims attempted to define. Nor is she seeking to secure claims any broader in scope than those claims. It is, however, a fact that the last-quoted language is not accurately or truthfully de-

ing adjective "substantially", as applied to the double length of the back is explained in a response to objections by the examiner, as follows:

"A careful examination of many different styles of garment made by applicant's licensee the Winget-Kickernick Co. of Minneapolis, Minnesota, shows that the two to one ratio is in general fairly accurate. In some cases the back will be a little more than double the length of the front as defined in the language of the claims, sometimes a little less and very commonly almost exactly double that length. The language of the claims 'substantially double in length' seems to be the general term which most nearly defines the applicant's invention, wherein for the first time the center line of the back from waist to bottom was made very much longer than the center line of the front from waist to division point, which division point in the prior art was usually at the center of the crotch."

The statements in the next preceding paragraph are set forth to emphasize that this patent was for a definitely set forth method and not for a general method which could cover all ways of reaching the same result.

In the accused garment, the relative lengths of the back and front members are not "substantially" as required by the patent, even if the two inserts be treated as part of the back. However, there is really no back piece and the inserts are not merely colorable avoidances of the patent. Each of them is of a definite shape and is placed in a definite place in the garment to perform a definite function—the arrow-head insert gives fullness at the seat, the elongated rectangular insert fullness at the crotch. There is no infringement.

### Trademark.

Appellee Winget Kickernick Company has a registered trademark of the word "Kickernick". Appellant La Mode Garment Company has a later registered trademark of the word "Kickaway." These marks are used by the respective owners in marketing their garments. Appellee charged infringement of its trademark by the use of "Kickaway" on the part of appellants and, also, unfair competition.

Appellants claim that these issues are foreclosed by an adjudication of the same issues in an action brought by the Winget against the La Mode in the Northern District of Illinois. Winget Kickernick Co. v. La Mode Garment Co., D.C., 42 F.2d 513.

Appellees seek to avoid the force of this prior adverse adjudication on the grounds following: that the decision was based solely upon a comparison of the two trademarks and without evidence of actual passing off of one garment for the other; that appellee Neilson was not a party to that action; that the court did not have before it La Mode garments like the accused or similar to those made under the Neilson patents; that information as to such La Mode garments was wilfully withheld from

---

scriptive of this feature of her invention for the reason that 'the bottom edges of the front part' will vary in position according to whether the garment is made with long or short legs, and that this variation in the length of the legs does not affect in any way the actual relation in length between the central lengths respectively of the front and back of the garment, which relation is an essential feature of affiant's invention. These lengths measured from the waistline to the bottom of the back and in the front of the garment from the waistline to the starting point of the division respectively are substantially constants for any given sized garment regardless of the length of the legs, the length of the waist above the waistline, or the character of material used. While the lengths recited in the original claims for the purpose of comparison are actually and necessarily variables, depending upon the length of the leg of the garment, and wherein the variations do not affect the true relation of front and back, which constitutes an important part of Affiant's invention.

"It follows that with some garments the language of the original claims would correctly define the invention used therein, and yet with other garments using identically the same invention the language quoted would not define it at all. The language which has been inserted in the claims with a slight amendment, does, Affiant believes, accurately define that feature of her invention regardless of the length of the legs of the garment or the character of the finish thereof, and such language is clearly supported by the original disclosure, particularly that of the drawings, which were made from data furnished by Affiant and were intended to be fair illustrations of patterns for actual garments such as had been made and sold prior to the time such drawings were made."

the court, thus constituting a fraud upon the court; that the choice of "Kickaway" was a deliberate attempt to take advantage of a wide and expensive advertising of appellees' garments under the mark "Kickernick".

In the above case, Judge Lindley states the proposition presented by the complaint to be "that the defendant's trade-mark 'Kickaway' infringes and that by the use of the same defendant has been guilty of unfair competition." Page 514. After an exhaustive examination of authorities, he states his conclusion as follows:

"From an examination of these cases and the facts as they appear in the case at bar, I am of the opinion there is no probable confusion between the two trade-marks; that plaintiff is not entitled to monopoly in its alleged trade-mark; and that plaintiff's bill should be dismissed for want of equity at the plaintiff's costs."

No appeal was taken from the decree entered dismissing the complaint and it has become final.

Appellants rely upon Rock Spring Distilling Co. v. W. A. Gaines & Co., 246 U. S. 312, 38 S.Ct. 327, 62 L.Ed. 738, and Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065, as stating the rule which, when applied here, results in establishment of the above decision in the Northern District of Illinois as determinative of the issues here of trademark infringement and of unfair competition. These cases are simply instances of the application of res adjudicata to trademark (Rock Spring Case) and patent (Kessler Case) infringement actions. The expressions and holdings in those cases are to be understood only as applying res judicata. Therefore, the question is one of the applicability here of res judicata as represented by the decision in the Northern District of Illinois.

As a starting point, we may take it that this decision of Judge Lindley is here applicable and governing unless for one or more of the above reasons advanced by appellees (the Gaines and Kessler Cases, supra). The first reason urged by appellees is the decision was based on purely technical considerations and not in the light of evidence of actual passing off of Kickaway garments for Kickernick garments brought about by similarity of the trade names used upon like kinds of garments. Careful consideration of the opinion of Judge Lindley and reading of the evidence before him (a part of this record) convinces that there

was no evidence of actual confusion or palming off before the court. The decision dealt only with the bare words embodied in the two trade marks. The court held "the ordinary word 'kick'" to be the basic word of the Winget mark; that monopoly thereof was restricted by prior usage in the art and by acquiescence in subsequent usage of other similar trade names and trade marks; that "there is no probable confusion between the two trade-marks." The present record contains no evidence of a palming off on the retailers by La Mode but it does contain substantial evidence of sales by clerks of appellant retailers of Kickaway garments to customers who asked for Kickernick garments. The situation seems to be that the similarity of names led or confused the clerks to think Kickaway was intended by the customer rather than there being a conscious fraud by the clerks.

The test of whether a trademark is infringed has been several times stated by this Court to be whether "an ordinarily prudent purchaser be liable to purchase the one, believing that he was purchasing the other." Reid, Murdoch & Co. v. H. P. Coffee Co., 8 Cir., 48 F.2d 817, 819, certiorari denied 284 U.S. 621, 52 S.Ct. 9, 76 L. Ed. 529; Queen Mfg. Co. v. Isaac Ginsberg & Bros., 8 Cir., 25 F.2d 284, 287; A. Y. Mc-Donald & Morrison Mfg. Co. v. H. Mueller Mfg. Co., 8 Cir., 183 F. 972, 974. While there is no evidence here of deception of any customer (the purchases here being by agents of the Winget), yet it is certain that if clerks who sell a product are confused to the point of selling one article for another (as here) such is evidence of the probability of confusion by customers.

Judge Lindley had before him simply the words of the two trademarks and therefrom determined the probability of deception of customers. He had no evidence of actual experience in the trade. Nor was such evidence then available so far as this record reveals. The evidence here was as to occurrences several years after that case was determined. While trademark infringement issues may be presented and determined on the basis of a bare comparison of the marks, yet it is evident that an entirely different situation is presented where the court has not only the marks before it but evidence of actual experience in the trade in the use thereof. Whatever the conclusion of the Judge might be upon merely a comparison of the marks, clearly he must be governed by what he believes the evidence

shows as to actual experience in the trade. It is the view of and effect upon the purchasing public which is determinative. From the additional evidence here, we might well surmise that had such evidence been before Judge Lindley he might have hesitated in declaring no infringement. Yet this additional evidence is not a ground to avoid the effect of the adjudication by Judge Lindley. The issue there determined —infringement of the Kickernick trademark by Kickaway—is the identical issue here. Res judicata does not depend upon the evidence or the reasons supporting the earlier decision. Southern Pacific Railroad Co. v. United States, 168 U.S. 1, 52, 62, 18 S.Ct. 18, 42 L.Ed. 355; Last Chance Mining Co. v. Tyler Mining Co., 157 U.S. 683, 691, 15 S.Ct. 733, 39 L.Ed. 859; Fitch v. Stanton Tp., 8 Cir., 190 F. 310, 314. This idea has been expressed also as follows: that a former adjudication is a finality "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195.

Another reason urged by appellees against the force here of Judge Lindley's decision is a difference in parties, in that Mrs. Neilson, a plaintiff here, was not a party to the suit in the Illinois District. This is not well founded because, under the circumstances here, she is in privity with the Winget-Kickernick Company, the plaintiff in that action. Rock Spring Distilling Co. v. W. A. Gaines & Co., 246 U.S. 312, 38 S.Ct. 327, 62 L.Ed. 738.

Another reason urged by appellees is that Judge Lindley did not have before him La Mode garments like those here accused. A related contention is that information of such garment was wilfully withheld from the court. Such consideration had no effect upon the decision of Judge Lindley, as is shown by his opinion. Moreover, the garments of La Mode before Judge Lindley were not so different from the Kickernick garments as to have had any influence upon his determination. The claim made there by counsel for Winget was that "the trademarks are used on the same type of goods, not the old style bloomer, but the new style, full seat bloomer, and that is the only thing of any importance in this particular case."

The last reason advanced for avoiding Judge Lindley's decision is that "Kickaway" was deliberately chosen to take advantage of the extensive advertising of "Kickernick". This might have a direct effect upon the measure of damages recoverable under section 96, title 15 U.S.C.A., but it is no sufficient reason to deny application of the decision of Judge Lindley as a bar here. Relief is granted from trademark infringement, irrespective of the intent of the infringer. Thaddeus Davids Co. v. Davids Mfg. Co., 233 U.S. 461, 471, 34 S.Ct. 648, 58 L.Ed. 1046, Ann.Cas.1915B, 322; Queen Mfg. Co. v. Isaac Ginsberg & Bros., 8 Cir., 25 F.2d 284, 287.

The result of what has been stated above concerning infringement of this trademark is that we hold (1) that the Winget-La Mode Case is a bar here and (2) therefore, that "Kickaway" as applied to garments, such as bloomers and drawers, does not infringe the trademark "Kickernick".

### Unfair Competition.

Trademark law is properly a statutory branch of the broader law of unfair competition. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713; Sweet Sixteen Co. v. Sweet "16" Shop, 8 Cir., 15 F.2d 920, 921; G. & C. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369, 372, affirmed 241 U.S. 22, 36 S.Ct. 477, 60 L.Ed. 868. From what has been stated above in discussing the evidence as to trademark infringement, it is evident that, irrespective of infringement, the record here sustains the finding and the decree as to existence of unfair competition.

Also, the decision of Judge Lindley is no bar here when the issues and the evidence before him are considered. Unfair competition was before him only in the sense that a claimed trademark infringement could be unfair competition. There was, before him, no evidence of actual unfair practices and he decided no issue of unfair competition of the character here involved.

### Liability of La Mode Garment Company.

The decrees in each of the two infringement actions were directed not only against the defendant therein but also against the La Mode Garment Company, which was not a nominal party in either action. It was made subject to the injunction and to the accounting for profits and for damages.

Appellant La Mode Garment Company contends that, not being a party to either of those actions, no decree could be entered against it therein. This contention is sound. The relation of the La Mode to each of those actions was, at most, that of an indemnifying manufacturer which assumed the defense for its customer defendant. La Mode contends that it did not have such control over this defense as to bring it within the rule which makes an adjudication binding upon one, not a party, assuming a defense.[2] Expressly, we do not examine nor determine whether appellant, La Mode, is so bound. In order to test the broad issue here, we will assume that the conduct of appellant was such as to make any determination against the defendant in each of these two actions binding upon it. Even so, the force thereof does not go beyond creating an estoppel in subsequent litigation between it and plaintiff concerning the same matters. This is merely to say that in some *subsequent* action the prior adjudication may be set up in estoppel as res judicata. It does not make it a party to the prior suit. This is directly ruled by Merriam Co. v. Saalfield, 241 U.S. 22, 29, 31, 33, 36 S.Ct. 477, 60 L.Ed. 868. Also, see; Souffront v. La Compagnie des Sucreries, 217 U.S. 475, 486, 30 S.Ct. 608, 54 L.Ed. 846; Louisville & N. R. Co. v. Schmidt, 177 U.S. 230, 20 S.Ct. 620, 44 L.Ed. 747; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433, 438, certiorari denied 280 U.S. 609, 50 S.Ct. 158, 74 L.Ed. 652; Gibson v. Eastern Rim & Wheel Co., 3 Cir., 32 F.2d 774, 775; Freeman-Sweet Co. v. Luminous Unit Co., 7 Cir., 264 F. 107, 109, certiorari denied 253 U.S. 486, 40 S.Ct. 482, 64 L.Ed. 1025. There are some District Court and State decisions to the contrary. Hoskins v. Hotel Randolph Co., 203 Iowa 1152, 211 N.W. 423, 65 A.L.R. 1125, and note p. 1134.

Appellees contend (1) that La Mode was made a party defendant because (they say) "the court entered its order consolidating the La Mode suit with the Kresge and Penney suits upon an express understanding that the La Mode Company was brought into the litigation as a party defendant to those suits to be bound by any decrees entered in them"; and (2) that, in the discussion out of which the consolidation order came, "counsel for La Mode in effect admitted that La Mode Company was before the court in a position to be adjudged an infringer of the patents in suit."

As to the first of these contentions. The action of La Mode (appeal No. 10,820) against appellees to enjoin prosecution of the two infringement actions (appeals No. 10,818 and 10,819) was filed two days before those two suits were set for trial. When those two infringement cases were called for trial, La Mode insisted upon a ruling on its application for an order (in its action) temporarily enjoining the prosecution

[2] For statements of this rule and application to various sets of facts—some involving patent litigation—see Bigelow v. Old Dominion Copper Co., 225 U.S. 111, 126, 32 S.Ct. 641, 56 L.Ed. 1009, Ann.Cas.1913E, 875; Souffront v. La Compagnie des Sucreries, 217 U.S. 475, 486, 30 S.Ct. 608, 54 L.Ed. 846; Rumford Chemical Works v. Hygienic Chemical Co., 215 U.S. 156, 160, 30 S.Ct. 45, 54 L.Ed. 137; Stryker v. Goodnow's Administrator, 123 U.S. 527, 538, 540, 8 S.Ct. 203, 31 L.Ed. 194; Pittsburgh Terminal Coal Corp. v. Williams, 3 Cir., 70 F.2d 65, 67, certiorari denied Pittsburgh Terminal Coal Corp. v. Bennett, 293 U.S. 617, 55 S.Ct. 149, 79 L.Ed. 705; City of Shidler v. H. C. Speer & Sons Co., 10 Cir., 62 F.2d 544, 548; N. O. Nelson Mfg. Co. v. F. E. Myers & Bro. Co., 6 Cir., 25 F.2d 659, 666; Elliott Co. v. Roto Co., 2 Cir., 242 F. 941; Rowe v. Hill, 6 Cir., 215 F. 518, 521; Bemis Car Box Co. v. J. G. Brill Co., 3 Cir., 200 F. 749; Foote v. Parsons Non-Skid Co., 6 Cir., 196 F. 951, 953; General Elec. Co. v. Morgan-Gardner Elec. Co., 7 Cir., 168 F. 52, 56; D'Arcy v. Staples & Hanford Co., 6 Cir., 161 F. 733; Greenwich Ins. Co. v. N. & M. Friedman Co., 6 Cir., 142 F. 944, certiorari denied 200 U.S. 621, 26 S.Ct. 758, 50 L.Ed. 624; City of Mankato v. Barber Asphalt Pav. Co., 8 Cir., 142 F. 329, 337–340; Jefferson Elec. L., H. & P. Co. v. Westinghouse Elec. & Mfg. Co., 3 Cir., 139 F. 385; Penfield v. C. & A. Potts & Co., 6 Cir., 126 F. 475, 479, 480; Hanks Dental Ass'n v. International Tooth Crown Co., 2 Cir., 122 F. 74; Id., 194 U.S. 303, 24 S.Ct. 700, 48 L.Ed. 989; Lane v. Welds, 6 Cir., 99 F. 286, 288; Cramer v. Singer Mfg. Co., 9 Cir., 93 F. 636, certiorari denied 175 U.S. 725, 20 S.Ct. 1022, 44 L.Ed. 338, reversed on other grounds 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437; Andrews v. National F. & P. Works, 7 Cir., 76 F. 166, 173, 36 L.R.A. 139, affirmed National F. & P. Works v. Oconto Water Supply Co., 183 U.S. 216, 22 S.Ct. 111, 46 L.Ed. 157; David Bradley Mfg. Co. v. Eagle Mfg. Co., 7 Cir., 57 F. 980.

of the infringement suits. Thereupon, counsel for appellees stated he had prepared an answer to the petition of La Mode and proposed to file it and go to trial on all three suits together. He stated this would be done "but I make one condition, and that is that these gentlemen agree that any decrees that are entered in this case [the two infringement cases] shall actually be binding upon the La Mode Garment Company." He then asked and repeatedly asked counsel for La Mode to assent thereto. No assent was given but La Mode continued to insist upon a ruling on its application for temporary injunction and to oppose taking up of the infringement suits. The court then stated:

"The Court: Well, as the court understands the issues they are the same in the two cases that were set for trial, and substantially the same in the case that recently has been filed asking for a temporary injunction. The issues being substantially the same, the same parties in effect concerned, the court sees no reason why they should not be consolidated, the testimony may then be taken, and one trial will dispose of the three cases. An exception may be entered to the ruling of the court."

We find no basis in the record for the statement that the cases were consolidated with any understanding that La Mode would be subject to decrees entered in the infringement suits. There is an utter absence of consent thereto by La Mode. There is no appearance, as a party, therein. While the court in its findings, in the action brought by La Mode, finds that the answer therein was filed and the suits consolidated for trial upon condition that La Mode "be held as a party to said suits against said S. S. Kresge Company and J. C. Penney, Incorporated, and be bound by the decrees

therein", there is no basis for such finding in the record.

As to the second contention that counsel for La Mode made statements amounting to an admission that La Mode was subject to decrees in the two infringement cases. The language relied on is the italicized portion of the following statement:

"We have filed a bill in equity in this Court, and if Mr. Whiteley feels that he wants *a judgment against the La Mode Company, Equity Rule 30* [28 U.S.C.A. following section 723] *I believe, covering the subject of counter claims, gives him all the right in the world to bring his counter-claim against whom he claims is the nominal defendant in this case and the real defendant."*

Far from amounting to the admission claimed, this statement is a clear indication —if not invitation—that if counsel for plaintiffs (appellees) in the infringement suits want to bind La Mode, the proper way is to file a counter claim in the action brought by La Mode.

Another contention of appellees is as follows. The testimony terminated November 26, 1935, at which time, the parties were given thirty, sixty and thirty days, respectively, after delivery of transcript of the evidence to file briefs. In the La Mode brief, counsel for appellees claims to have been first apprised that La Mode contended it would not be bound by decrees entered in the infringement suits. On April 14, 1936, counsel for appellees filed a "Motion to amend Answer Nunc Pro Tunc" in the suit brought by La Mode.[3] The court took no action upon this motion and later (July 20, 1936) filed its findings and conclusions and entered decrees in the three cases. In this situation, appellees contend that, al-

[3] Such motion was as follows:
"Now come the defendants, Winget Kickernick Company and Mary D. Neilson, and move the Court:
"1. That Answer filed herein on November 18, 1935, be amended by adding thereto as a counterclaim all of the allegations of the complaint filed in the consolidated cases Winget Kickernick Company and Mary D. Neilson versus S. S. Kresge Company, Equity No. 2810, and Winget Kickernick Company and Mary D. Neilson versus J. C. Penney Company, Inc., Equity No. 2811.
"2. That said amendment be filed nunc pro tunc as of the date of the Answer herein, to-wit, November 18, 1935.
"3. That Answers heretofore filed on behalf of defendants in consolidated cases Winget Kickernick Company and Mary D. Neilson versus S. S. Kresge Company, Equity 2810, and Winget Kickernick Company and Mary D. Neilson versus J. C. Penney Company, Inc., Equity 2811, be received as Answers to said Counterclaim as of the date November 18, 1935, and that all proofs made in support of said complaints and answers be available to plaintiff-respondent and to defendant-counterclaimant in support of and defense against said counterclaim."

though the court did not act upon the motion, "The trial proceeded as if the amendment had been made, and the court considered the La Mode Company as a party defendant in the Kresge and Penney suits and held them as bound by the decrees."

The difficulty in acceding to this contention is that the trial court affirmatively demonstrates that it did not regard this amendment as made. The court ignored the motion to amend; made no findings, stated no conclusions and entered no decree according recovery in the La Mode suit; dismissed the action by La Mode; and held it liable in the decrees in the two infringement cases. The clearly stated and sole basis for including the La Mode in those two decrees was that it was subject thereto because counsel for plaintiffs therein had stated that he would file an answer in the La Mode suit and try the three cases together on condition that La Mode would consent to be subject to such decrees and that the answer was filed, the cases consolidated and the trials had under that condition. The fatal defect is that La Mode never consented to such condition and consistently opposed consolidation on any terms. The situation is that counsel for La Mode pointed out, before the trial began, that appellees might make it liable by filing a counter claim, which appellees failed to do—going to trial on a bare answer to La Mode's petition; that La Mode did not accede to the request that it be subject to decrees in the infringement suits; that appellees and the court proceeded on the theory that La Mode would be so subject; that after the conclusion of the evidence, when appellees discovered La Mode contended otherwise, they sought to file the counter claim they had refused or failed to file in time; that such counter claim was never permitted made nor regarded as made by the court; that the court made no findings nor stated any conclusions in the La Mode case which would justify recovery against it therein; that it dismissed that action; that appellees have taken no appeal therefrom. In this situation, we think this contention must be denied.

The parties have argued many other matters. We need notice only one because none of the others affect the results as above stated. The one exception is the contention of appellants that appellees are barred by laches and equitable estoppel from bringing either of the infringement suits.

The record here holds no basis for this contention and it is denied.

## Conclusion.

The results of the foregoing opinion are as follows.

In appeals No. 10,818 and No. 10,819, the cases will be remanded with instructions to set aside the respective decrees and enter in lieu thereof decrees determining non-infringement of the patents, non-infringement of the trademark, and unfair competition as to the respective defendants S. S. Kresge Company and J. C. Penney Company, Incorporated, and ordering injunction and accounting against such on account of such unfair competition. In appeal No. 10,820, the decree is affirmed.

Costs in the consolidated cases, both in the trial court and in this Court, to be assessed on the basis of two-thirds against appellants and one-third against appellees.